# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| ROBERT E. GARRIS, | ) |
|---|---|
| Plaintiff, | ) |
| | ) 2:13-cv-157 |
| v. | ) |
| CAROLYN COLVIN,[1] *Acting Commissioner of Social Security*, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER OF COURT

## I. INTRODUCTION

Robert E. Garris, Jr. ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c), for judicial review of the final determination of the Commissioner of Social Security ("Commissioner"), which denied his application for supplemental security income ("SSI") and disability insurance benefits ("DIB") under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–403, 1381–1383(f).

## II. BACKGROUND

### A. Plaintiff's age, vocational history, and alleged disability

Plaintiff was born on September 14, 1965, making him forty-three (43) years old on the date of his application and forty-five (45) years old at the time of the ALJ's decision. Under 20 C.F.R. §§ 404.1563 and 416.963, he is considered a "younger person." He earned a GED and has past work experience as a blacktop foreman, machine/press operator, a pallet production operator, and a general laborer. (R. 298, 302).

---

1. Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Defendant has consented to the substitution of Carolyn W. Colvin for Michael J. Astrue as the defendant in this suit. *See also* 42 U.S.C. § 405(g).

Plaintiff has not engaged in substantial gainful work activity since his disability onset date of October 30, 2008. (R. 34). His alleged disability stems from carpal tunnel syndrome, lumbar spine impairment, severe back pain, headaches, hypertensive cardiovascular disease/hypertension, depression, and insomnia. (R. 226-67, 296).

### B. Medical Evidence

#### 1. *Treating Sources*

The earliest indication of Plaintiff's impairments date back to a 1997 work injury, when a "board hit him in [the] back, shoulder/neck," and subsequent rotator cuff surgery on the left arm (R. 360, 450). The primary focus of Plaintiff's medical records is, however, concentrated on the time period after 2006, when he allegedly woke up one day with a weak left arm. (R. 450). Throughout this time, Plaintiff's primary care was provided at Latrobe Family Health Center by John Horne, M.D., Stephen Mills, M.D., and Lydida Manzini, CRNP, with Dr. Horne acting as his primary care physician (hereinafter, the "treating physician"). (R. 356-79, 415-54, 497-504, 532-550).

In May 2007, Plaintiff underwent carpal tunnel release surgery from Matthew Wetzel, M.D., a colleague of Dr. Horne at Latrobe Family Health Center (R. 356-72). In a July 3, 2007 letter to Dr. Horne, Dr. Wetzel noted that Plaintiff had experienced good relief of his left hand numbness, 4/5 grip and muscle strength in his left hand and arm (R. 373). Dr. Wetzel also noted that a February 2007 EMG report showed "no evidence of cervical radiculopathy" and that a MRI showed a "C5-6 disc herniation with mild to moderate left foraminal stenosis" as well as a "C6-7 disc bulge with no significant foraminal narrowing." (R. 373). Dr. Wetzel concluded by suggesting a more conservative treatment route, opining that surgical intervention would not improve Plaintiff's symptoms. (R. 373). In October 2007, Plaintiff returned to Dr. Horne who

adjusted his pain medications and referred Plaintiff to a pain clinic for a second opinion. (R. 376-77).

Between January and April 2008, Plaintiff was evaluated and treated by Brinda Navalgund, M.D., Rodney B. Dayo, D.O., and Louis R. Olegario, M.D., at Excela Health Pain Management Center by reference of Dr. Horne. (R. 381-88, 391-95, 401-04). All three physicians reported Plaintiff positive for upper extremity pain, neck pain, muscle weakness, tingling/burning/numbness neurology, difficulty with walking, difficulty with stairs, difficulty with sit to stand, difficulty with lifting, insomnia, restricted flexion and restricted range of motion. (R. 381-88, 391-95, 401-04).

On March 11, 2008, Dr. Dayo's physical examination revealed left upper extremity pain, neck pain, muscle weakness, and paraspinal muscle spasm. (R. 381-88). His neurological examination revealed gross motor testing at 5/5 bilaterally, normal sensation, and a normal gait. (R. 381-88). To manage his pain, Dr. Dayo performed an out-patient "[s]pinal cord stimulator trial with one lead placement" operation on Plaintiff. (R. 387-88).[2] The record reflects that the spinal cord stimulator was removed one week later on March 18, 2008. (R. 382). In his treatment notes dated April 29, 2008, Dr. Horne observed that the spinal cord stimulator was removed because it felt "jittery." (R. 413).

The notes of an October 21, 2008 pain management consultation with Dr. Mills and Nurse Manzini describe pain in the left shoulder, limited/decreased range of motion, upper extremity strength of 3/5, lumbar tenderness, and Plaintiff's feeling that he "just gets by" with his current medication. (R. 448). On October 29, 2008, one day prior to the alleged disability onset date, Dr. Mills observed that x-ray's of Plaintiff's spine revealed, "moderate disc

---

2. A spinal cord stimulator, also known as a dorsal column spinal cord stimulator, is an electrical device implanted against the spinal cord to control pain. J. E. Schmidt, 2 Attorney's Dictionary of Medicine, D–194.1 (2013).

3

narrowing at C5-6, small to moderate marginal osteophytes, slight posterolisthesis at C5," and the presence of "[m]inimal degenerative changes of the lower facet . . . . " (R. 415-16). During a December 30, 2008 follow-up with Dr. Horne and Nurse Manzini, Plaintiff reported that he was unable to do much and nothing seemed to alleviate his pain despite his best efforts to stay as physically active as possible. (R. 447). Treating notes detail upper extremity strength remaining at 3/5, tenderness of the left shoulder, with an assessment of chronic shoulder pain with reflex sympathetic dystrophy/chronic lumbar pain, and instructions to return three months later in March. (R. 447).

After that visit, Nurse Manzini provided Plaintiff a jury release note, indicating he would be unable to participate in jury duty due to his inability to sit for long periods of time. (R. 418). Nurse Manizini also completed an "Upper Extremity Impairment Questionnaire" for Plaintiff in which she indicated that Plaintiff could lift and carry up to five pounds occasionally with his left arm; estimated that his symptoms would increase if he performed significant reaching, handling, or fingering; and, assessed the Plaintiff with "marked" limitations in his ability to use his left upper extremity to grasp, turn, twist, perform fine manipulation, and reach. (R. 419-24).

Plaintiff followed-up his pain management consultation in March 2009 and visited again in May and August 2009. Dr. Horne's treating notes from those visits indicate decreasing range of motion for the left shoulder and increasing pain in the left hand from reflex sympathetic dystrophy. (R. 444-46). Those same notes also indicate that Dr. Horne made several adjustments to the type and dosing of Plaintiff's medications during those visits. (R. 444-46).

On October 16, 2009, Dr. Horne completed a Lumbar Spine Impairment Questionnaire and a Bilateral Manual Dexterity Impairment Questionnaire. (R. 425-32, 432-38). On the first form Dr. Horne noted the following:

1. Plaintiff suffered from impairments of reflex sympathetic dystrophy of the left arm, chronic left shoulder pain, chronic neck pain, history of left carpal tunnel surgery, and low back pain;

2. Those diagnoses were supported by findings of limited range of motion of the left shoulder, tenderness of the left upper extremity, muscle spasm at the left subscapular region, sensory loss in the left hand, and muscle atrophy and weakness in the left upper extremity;

3. It was unlikely that Plaintiff's impairments would ever be asymptomatic;

4. Plaintiff would be able to sit for two hours and stand/walk for up to one hour in an eight-hour workday, required a sit/stand option every one to two hours, and would be able to lift up to five pounds frequently and ten pounds occasionally with only the right hand; and, as a result

5. It was unlikely that Plaintiff would be able to perform strenuous work.

(R. 425-32). On the second form, Dr. Horne noted that Plaintiff's impairments resulted in marked limitations in his ability to use his left hand for grasping, turning, or twisting objects, or use arms for reaching, and moderate limitations in fine manipulation. (R. 432-38). With respect to his right arm, Dr. Horne noted that Plaintiff's impairments resulted in moderate limitations in grasping, turning, twisting objects, and reaching, and only minimal limitations in fine manipulation. (R. 437).

Later that month, on October 29, 2009, an unknown resident physician in Dr. Horne's office noted tenderness over Plaintiff's cervical spine, increased hypersensitivity in the left hand, and concluded with an assessment of left hand reflex sympathetic dystrophy and left-sided cervical stenosis. (R. 441).

On December 29, 2009, an agent with the Social Security Administration interviewed Dr. Horne and noted:

> Spoke with Dr. Horne. The Patient has some pain in the right shoulder, but the decreased range of motion mentioned in the 10/16/09 office note refers to the left shoulder. Patient had surgery previously with Dr. Buterbaugh, but surgery will not provide any further help. There is no imaging after 10/2008. Patient can walk fairly normal, but he does sometimes limp. There are limitations in the patient's

5

> ability to perform fine/dexterous movements, left worse than right. Although the patient did not say anything to Dr. Horne about needing someone to tie his shoes, as he mentioned in the questionnaire for SSA; Dr. Horne states that is consistent with his limitations in fine/dexterous movements.

(R. 497).

On, June 8, 2010, cervical spine x-rays delivered to Dr. Horne and Dr. Mills revealed degenerative changes at C5-C6 with foraminal narrowing on the right and no other abnormalities. (R. 537).

On a script note, dated March 3, 2011, Dr. Horne indicated that Plaintiff remains disabled due to left upper extremity reflex sympathetic dystrophy and that it was his clinical impression that Plaintiff's disability is permanent. (R. 539).

### 2. *Non-Treating Sources*

On February 23, 2010, Plaintiff was seen by Robert L. Davoli, M.D., a Consultative Examiner for the Bureau of Disability Determination. In his report of February 26, 2010, Dr. Davoli noted the following of Plaintiff: (1) that his X-rays showed minimal disease in his neck and lower spine; (2) that he maintained a normal gait; (3) that while range of motion showed abduction and forward flexion to only 90 degrees, Plaintiff's effort appeared "very, very poor"; (4) that Plaintiff had limited neck extension to 20 degrees, but the remainder of his range of motion examination was normal; (5) that sitting, standing, and walking were "not an issue," but that Plaintiff would be limited to lifting and carrying 25-50 pounds; that (6) Plaintiff may have a limited ability to push and pull with his upper extremities due to his shoulders, but his opinion was limited due to Plaintiff's poor effort; and that (7) Plaintiff had a limited ability to reach with his shoulders, but no limitations in handling, fingering, or feeling. (R. 505-08).

On March 10, 2010, Dilip S. Kar, M.D., a state agency physician, reviewed Plaintiff's medical evidence and concluded in a SSA-4734-BK RFC form that Plaintiff would be able to

perform exertion requirements of up to medium work with an unlimited ability to use his upper extremities for operating hand controls. On that form, Dr. Kar noted that the treating or examining source statement regarding the claimant's physical capacities was in the file and that the treating/examining source conclusions about the claimant's limitations or restrictions were not significantly different from his personal findings. Dr. Kar expressed that Dr. Davoli's opinion of Plaintiff's abilities was supported by medical findings and not inconsistent with other evidence in the record. (R. 511-18). To describe Plaintiff's limitations, Dr. Kar inserted a photocopy of Dr. Davoli's consultative exam notes and Dr. Mill's October 29, 2008 cervical spine impressions onto the SSA-4734-BK RFC form. *Compare* (R. 516-17), *with* (R. 505, 507) *and* (R. 415).

On March 10, 2010, Roger Glover, Ph.D., a state agency non-examining reviewer, opined that Plaintiff's depressive disorder causes mild restrictions in his activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, and pace. (R. 519-31). Dr. Glover ultimately found that Plaintiff's mental impairment was non-severe. (R. 519-31).

  **C.**  **Hearing Testimony**

At the April 12, 2011 hearing, Plaintiff described the problems he experienced with his arms, back, and neck.

With regard to his left arm, he expressed that he was unable to use it for virtually any task, including as a helper hand with tasks performed by his dominant right hand. (R. 61-64). Plaintiff noted that he generally kept his left hand in his pants pocket to keep his arm from loosely swinging about – a movement he described as painful. (R. 64). With regard to his right arm, Plaintiff testified that he was experiencing symptoms similar to what he felt in his left arm,

before the left arm became completely disabled. (R. 65). These limitations in his right and left arms make it difficult for Plaintiff to complete routine daily tasks, such as dressing himself entirely on his own and lifting a glass of water. (R. 65-66).

With regard to his back and neck, Plaintiff described a constant pain that makes it difficult for him to move around, bend over, lift his arms, and sleep. (R. 67-70). This pain has caused him to lead a mostly sedentary life since he last worked. (R. 69, 77-80). He estimated that, at most, he could probably stand for about twenty minutes and walk for about five minutes before needing to rest. (R. 78-83)

Plaintiff described his current medical care and treatment as being at an impasse. The treatment he received did little to stop his symptoms and pain. He has taken numerous medications, undergone several surgeries, and has even had a spinal stimulator placed in his back to try and reduce his pain. (R. 67-68). As of the hearing, his doctors have been hesitant to offer more invasive treatment out of fear of disabling him more. (R. 68). He has been told to deal with his situation the best he can, and "read his body" as to what he specifically can and cannot do. (R.74-75).

Plaintiff testified that he once enjoyed many physical activities prior to his impairments, such as swimming, walking, baseball and softball. (R. 83). His life today mostly consists of sitting on a loveseat and watching endless hours of television. (R. 83). While he admitted that he can drive his car, he qualified that ability by noting he seldom drives because his physical limitations make it impossible to switch gears and he is afraid of getting into an accident. (R. 58).

After hearing testimony from Plaintiff, the ALJ sought testimony from a vocational expert to determine the availability of jobs in the national economy that an individual such as Plaintiff could perform (R. 84).

The ALJ asked the vocational expert to consider an individual of Plaintiff's age, education, and work history

> who is limited to light work with occasional overhead reaching with weights in excess of ten pounds only. So it would be occasional for overhead reaching to grab weights of greater than ten pounds, less than ten pounds would be more frequent; simple, routine, repetitive tasks not performed at a fast-paced production environment, involving only simple work-related decisions; and, in general, relatively few workplace changes.

(R. 86). The vocational expert testified that such an individual would be able to perform the unskilled, light jobs of garment sorter, fruit cutter, and folder, which exist in significant numbers in the national economy (R. 86-87).

The ALJ then asked the vocational expert to consider the same individual, who would be able to perform light work that involved use of the left non-dominant extremity as a helper hand, occasional fingering, handling, and feeling with the left hand, no pushing or pulling with the left arm, no overhead reaching with either arm, no exposure to hazards, and a sit/stand option every hour for five minutes. (R. 87). The vocational expert responded that such an individual could perform the light jobs identified in the prior hypothetical of garment sorter, fruit cutter, and folder. (R. 88). The vocational expert further explained that although these jobs required frequent bilateral reaching, handling, grasping, and fingering, they could be performed by using one hand to hold an object and the other hand to perform the required task. (R. 88). Moreover, the vocational expert noted that he was assuming the individual could use his dominant extremity in an unlimited capacity and his non-dominant extremity occasionally. (R. 88, 94-95). In response to follow-up questions and adjusted hypotheticals, the vocational expert admitted that an individual in Plaintiff's condition would not be capable of performing any job with significant representative numbers in the national economy if Plaintiff was limited to sedentary work, with only a light exertion level requirement and the use of only the dominant hand. (R. 88-90).

### D. Procedural History

Plaintiff applied for DIB and SSI on September 6, 2009. Plaintiff's applications were denied on March 11, 2010 and he submitted a timely request for an administrative hearing on May 5, 2010.

Plaintiff's case was presented at an April 12, 2011 hearing before Administrative Law Judge Joanna Papazekos (the "ALJ"). (R. 52). Plaintiff was represented by counsel and testified at the hearing. (R. 52-98). Mitchell Schmidt, an impartial vocational expert, also testified. (R. 52). On July 22, 2011, the ALJ rendered an unfavorable decision to Plaintiff. (R. 29-31). Plaintiff filed a request for review on June 12, 2012 with the Appeals Council to reconsider the ALJ's decision. (R. 28). The Appeals Council denied Plaintiff's request for review on December 4, 2012, making the ALJ's decision the final decision of the Commissioner. (R. 1-3).

Prior to applying for DIB and SSI in this matter, Plaintiff applied for the same on January 17, 2007 with an alleged disability beginning December 26, 2006. (R. 103). Those claims were denied by an ALJ on October 29, 2008. (R. 100). On July 19, 2009, the Appeals Council denied Plaintiff's request to review the ALJ's decision. (R. 114).

Plaintiff filed a complaint with this Court on January 30, 2013, seeking judicial review of the ALJ's decision. (ECF No. 1). The parties have now filed cross-motions for summary judgment (ECF Nos. 8, 10) and briefs in support (ECF Nos. 9, 11).

### III. LEGAL ANALYSIS

#### A. Standard of Review

The Act limits judicial review of disability claims to the Commissioners final decision. 42 U.S.C. §§ 405(g); 1383(c)(3). If the Commissioner's finding is supported by substantial evidence, it is conclusive and must be affirmed by the Court. 42 U.S.C. § 405(g); *Rutherford v.*

*Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). The United States Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Capato v. Commr. of Soc. Sec.*, 631 F.3d 626, 628 (3d Cir. 2010) (*internal citation omitted*). It consists of more than a scintilla of evidence, but less than a preponderance. *Thomas v. Comm'r. of Soc. Sec.*, 625 F.3d 798 (3d Cir. 2010). As set forth in the Act and applicable case law, this Court may not undertake a de novo review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190 (3rd Cir. 1986), *cert. denied*, 482 U.S. 905 (1987). The Court must simply review the findings and conclusions of the ALJ to determine whether they are supported by substantial evidence. 42 U.S.C. § 405(g); *Schaudeck v. Comm'r. of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

In situations in which a Plaintiff files concurrent applications for SSI and DIB, courts have consistently applied a single disability standard under the Act. *See Burns v. Barnhart*, 312 F.3d 113, 119 n. 1 (3d. Cir. 2002) ("This test [whether a person is disabled for purposes of qualifying for SSI] is the same as that for determining whether a person is disabled for purposes of receiving social security disability benefits [DIB]. *Compare* 20 C.F.R. § 416.920, *with* § 404.1520."); *Sullivan v. Zebley*, 493 U.S. 521, 525 n.3 (1990) (holding that regulations implementing the Title II [DBI] standard, and those implementing the Title XVI [SSI] standard are the same in all relevant aspects); *Morales v. Apfel*, 225 F.3d 310, 31516 (3d Cir. 2000) (Plaintiff's burden of proving disability is the same for both DIB and SSI).

To determine whether an adult Plaintiff is or is not disabled, the Commissioner utilizes a five-step sequential evaluation. 20 C.F .R. §§ 404.1520 and 416.920 (1995). This process requires the Commissioner to consider, in sequence, whether a Plaintiff (1) is working, (2) has a

11

severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his or her past relevant work, and (5) if not, whether he or she can perform other work. See 42 U.S.C. § 404.1520; *Newell v. Comm'r. of Soc. Sec.*, 347 F.3d 541, 545-46 (3d Cir. 2003) (*quoting Burnett v. Comm. of Soc. Sec.*, 220 F.3d 112, 118–19 (3d Cir. 2000)).

To qualify for disability benefits under the Act, a Plaintiff must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Fargnoli v. Massanari*, 247 F.3d 34, 38-39 (3d Cir. 2001) (internal citation omitted); 42 U.S.C. § 423(d)(1) (1982). This may be done in two ways:

(1) by introducing medical evidence that Plaintiff is disabled per se because he or she suffers from one or more of a number of serious impairments listed in 20 C.F.R. Regulations No. 4, Subpt. P, Appendix 1. *See Heckler v. Campbell*, 461 U.S. 458 (1983); *Newell*, 347 F.3d at 545-46; *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004); or

(2) in the event that Plaintiff suffers from a less severe impairment, by demonstrating that he or she is nevertheless unable to engage in "any other kind of substantial gainful work which exists in the national economy . . . ." *Campbell*, 461 U.S. at 461 (citing 42 U.S.C. § 423(d)(2)(A)).

In order to prove disability under the second method, a Plaintiff must first demonstrate the existence of a medically determinable disability that precludes plaintiff from returning to his or her former job. *Newell*, 347 F.3d at 545-46; *Jones*, 364 F.3d at 503. Once it is shown that Plaintiff is unable to resume his or her previous employment, the burden shifts to the Commissioner to prove that, given Plaintiff's mental and physical limitations, age, education and

work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Rutherford*, 399 F.3d at 551; *Newell*, 347 F.3d at 546; *Jones*, 364 F.3d at 503; *Burns*, 312 F.3d at 119.

When a Plaintiff has multiple impairments which may not individually reach the level of severity necessary to qualify any one impairment for Listed Impairment status, the Commissioner nevertheless must consider all of the impairments in combination to determine whether, collectively, they meet or equal the severity of a Listed Impairment. *Diaz v. Comm'r. of Soc. Sec.*, 577 F.3d 500, 502 (3d Cir. 2009); 42 U.S.C. § 423(d)(2)(C) ("In determining an individual's eligibility for benefits, the Secretary shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity.").

### B. The ALJ's Opinion

The ALJ determined that Plaintiff was not disabled within the meaning of the Act at the fifth step of the sequential evaluation process. At step one, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since the alleged disability date. (R. 34). At step two, the ALJ found that Plaintiff had the following severe impairments: "degenerative disc disease of the cervical and lumbar spines, carpal tunnel syndrome, and reflex sympathetic dystrophy of the left upper extremity." (R. 35). At step three, the ALJ found that Plaintiff's impairments did not individually or collectively meet or medically equal a listed impairment. (R. 36). The ALJ then addressed Plaintiff's residual functional capacity ("RFC"), finding Plaintiff could

> perform light work as defined in 20 CFR § 404.1567(b) and 416.967(b), except work requiring more than occasional fingering, handling or feeling with the non-dominant hand, any pushing/pulling with the left, overhead reaching with either arm, or exposure to hazards. Additionally, Plaintiff is only able to use the non-dominant left hand as a helper for lifting, and Plaintiff would need a sit/stand option to be exercised every hour for not more than 10 minutes at a time.

(R. 36-37). At step four, the ALJ determined that these limitations would prevent Plaintiff from being able to perform his past heavy to very heavy work as a blacktop foreman, machine/press operator, a pallet production operator, and a general laborer. (R. 40). At step five, the ALJ found that even with the prescribed limitations, Plaintiff would be able to perform the nationally and regionally available jobs of garment sorter, fruit cutter, and folder. (R. 41). Thus, the ALJ determined that Plaintiff was not disabled within the meaning of the Act. (R. 41).

### C. Discussion

In this matter, the ALJ proffered an RFC assessment that contradicted the medical opinions of Plaintiff's treating physician and nurse. While the ALJ acknowledged a number of significant limitations regarding the type and frequency of work Plaintiff could perform, Plaintiff's treating physician and nurse had opined that Plaintiff was completely disabled. *Compare* (R. 419-24, 425-39) *with* (R. 36-37). The ALJ explained that in making the RFC assessment, she afforded only partial weight to the opinion of the treating physician and no weight to the opinion of the treating nurse. The ALJ reasoned that the opinions of the treating physician and nurse were inconsistent with the "totality of the evidence and appear[ed] to be based in large part, if not entirely, on [Plaintiff's] subjective allegations." (R. 40). Regarding the specific opinion of the treating nurse, the ALJ commented that she was unable to afford any weight to that opinion because the treating nurse was a "non-physician." (R. 40).

If an ALJ rejects a treating physician's opinion based upon alleged factual inaccuracies or mischaracterizations of the evidence, the ALJ's opinion is not supported by substantial evidence. *See e.g., Brownawell v. Commr. of Soc. Sec.*, 554 F.3d at 352, 357 (3d Cir. 2008); *Layton v. Astrue, 2010 WL 521190* (W.D. Pa. 2010); *Wilson v. Astrue*, 2009 WL 793039 at *16 (W.D. Pa. 2009) ("If the disability determination of an administrative law judge is based on erroneous facts,

it is not supported by substantial evidence."). In this matter, the ALJ assigned less weight to the opinions of the Plaintiff's treating physician based upon misstatements of the medical evidence. Therefore, remand is warranted because the ALJ's decision was not supported by substantial evidence.

First, the ALJ misstated the lack of evidence of certain spinal diseases and defects. To counter the medical evidence of Plaintiff's cervical and lumbar degenerative disc disease, the ALJ found that diagnostic studies of the spine revealed "only mild to moderate degenerative changes with no evidence of frank disc herniation, spinal stenosis, nerve root impairment, or archnoiditis." (R. 37). In support of this statement, the ALJ cited to exhibits C8F and C20F. (R. 37). These exhibits do not, however, discuss any of these conditions or lack thereof. To the contrary of the ALJ's statement, there are numerous documents that indicate Plaintiff did suffer from these conditions: (1) R. 373 (Plaintiff's carpal tunnel surgeon notes that foraminal stenosis and a disc bulge); (2) R. 391-96 (a pain specialist indicates Plaintiff has been diagnosed with cervical stenosis); and, (3) R. 442 (Plaintiff's treating physician confirms these diagnoses, noting a diagnosis of foraminal stenosis). In fact, the record contains only one reference to the fact that there was no evidence of frank disc herniation, spinal stenosis, nerve root impairment, or archnoiditis: in the October 2008 opinion of the ALJ in the Plaintiff's earlier case for benefits. (R. 100-113). That ALJ noted "there is no diagnostic evidence of disc herniation, spinal stenosis, nerve root impingement, arachnoiditis . . . ." (R. 110). Given that there is no evidence in the record to support this ALJ's statement, it appears likely that the ALJ relied on the statement from a prior opinion of a different ALJ rather than performing her own independent review of the medical records in this case.

Second, the ALJ misstated evidence of the Plaintiff's bilateral strength. To support a July 2007 report by Plaintiff's carpal tunnel surgeon that Plaintiff demonstrated good progress following a May 2007 release procedure, the ALJ cites a March 2008 pain management specialist who noted 5/5 strength bilaterally with normal/symmetrical sensation. (R. 37). The pain management specialist's report, however, does not mention 5/5 bilateral strength. Rather, the specialist noted 5/5 gross motor testing bilaterally. (R. 385). Furthermore, the ALJ failed to mention that later that same year, Plaintiff's treating physicians noted 3/5 upper extremity strength. (R. 447-48).

Third, the ALJ understates the Plaintiff's treatments for pain. To support her conclusion that a lack of invasive and extraordinary treatment in Plaintiff's medical history supports a less limited RFC, the ALJ highlights that there is "no evidence the [Plaintiff] has been prescribed other pain/treatment modalities such as a Tens Unit, back brace, bed board, cervical collar or wrist splints." (R. 38). The record does, however, reflect that Plaintiff's pain was treated with a number of modalities. In a January 29, 2009 questionnaire, Plaintiff's treating nurse noted that Plaintiff had "tried [a] tens unit in the past," but that it had not been effective. (R. 422). Plaintiff was treated in 2008 with a surgically placed spinal cord stimulator. (R. 381-88). The stimulator was placed in Plaintiff's cervical spine in April 2008, but removed one week later after complications developed. (R. 381-88, 413, 450). Regardless of effectiveness, these treatments were prescribed to Plaintiff.

Fourth, the ALJ misstates changes to the Plaintiff's pain medications. In concluding that Plaintiff's symptomology and impairments seem to be well controlled by his prescribed medications, the ALJ notes that "there is no evidence the [Plaintiff] experiences significant side effects from his medications or that his medications have been frequently changed or the dosages

16

altered due to side effects and/or ineffectiveness." (R. 38). In the October 16, 2009 Bilateral Manual Dexterity Impairment Questionnaire, however, Plaintiff's treating physician answered "yes" in response to the question "[h]ave you substituted medications in an attempt to produce less symptomatology or relieve side effects?" (R. 436). The physician's treating notes corroborate this answer and indicate a number of pharmaceutical dosing changes over the course of treating Plaintiff. (*See generally* R. 440-54).

Given these errors in the evaluation of the medical evidence, this case shall be remanded to the ALJ for further consideration consistent with this Memorandum Opinion. The Court need not address the Plaintiff's challenge to the ALJ's credibility determination inasmuch as the ALJ will necessarily re-evaluate this aspect in the course of reconsidering the medical evidence. The Court notes that on remand the ALJ should give consideration to evidence of the Plaintiff's limitations proffered by his treating nurse, a certified registered nurse practitioner.[3]

## IV. CONCLUSION

Under the Social Security regulations, a federal district court, upon review of a decision of the Commissioner denying benefits, has three options. It may affirm the decision, reverse the decision and award benefits directly to a claimant, or remand the matter to the Commissioner for further consideration. 42 U.S.C. § 405(g) (sentence four). In light of an objective review of all of the record evidence, the Court finds that the ALJ failed to support her opinion with substantial evidence and that the decision must be remanded to the ALJ for further consideration consistent with this Opinion. The Commissioner's decision in the present case may, however, ultimately be

---

3. In her opinion, the ALJ afforded no weight to the opinion of CRNP Manzini "since she is a non-physician." (R. 40). Although the ALJ is not required to give any weight to the medical opinion of a non-physician for the purpose of establishing impairment, opinions relating to the specific limitations caused by a medical impairment must be considered. Social Security Ruling 06-03p; *Magno v. Astrue*, 2010 WL 322144, *5 (W.D. Pa. Jan. 27, 2010). Because CRNP Manzini's treatment notes discuss the limitations caused by the Plaintiff's impairments, and not her diagnosing of those impairments, the ALJ should have considered those records.

correct and nothing in this Memorandum Opinion should be taken to suggest that the Court has presently concluded otherwise.

For these reasons, the Court will grant the Motion for Summary Judgment filed by Plaintiff insofar as he seeks remand, deny the Motion for Summary Judgment filed by the Commissioner, and remand this case for further proceedings.

An appropriate Order follows.

McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBert E. GARRIS,<br><br>     **Plaintiff,**<br><br>  v.<br><br>CAROLYN COLVIN, *Acting Commissioner of Social Security*,<br><br>     **Defendant.** | )<br>)<br>)<br>) 2:13-cv-157<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER OF COURT

AND NOW, this 17th day of December 2013, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that the Motion for Summary Judgment (ECF No. 8) filed by Plaintiff, Robert E. Garris, Jr. is **GRANTED IN PART AND DENIED IN PART**; and the Motion for Summary Judgment (ECF No. 10) filed by Carolyn W. Colvin, Acting Commissioner of Social Security, is **DENIED**.

**IT IS FURTHER ORDERED** that the Decision of the Commissioner of the Social Security Administration, is hereby **VACATED** and this action is **REMANDED** for reconsideration, rehearing, and/or further administrative proceedings consistent with this Memorandum Opinion.

  The Clerk shall docket this case closed.

                   BY THE COURT:

                   s/Terrence F. McVerry
                   United States District Judge